# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00353-CV

**Appellant, Cambridge Holdings, Ltd.// Cross-Appellant,**
**The Cambridge Condominiums Council of Owners**

**v.**

**Appellee, The Cambridge Condominiums Council of Owners// Cross-Appellee,**
**Cambridge Holdings, Ltd.**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT**
**NO. D-1-GN-05-002606, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

The principal issues in this appeal concern whether a condominium regime's council of owners has acquired an easement permitting use of a portion of one owner's condominium unit "for the limited purpose of fire/emergency ingress and egress" by the other owners. While rejecting the council's claims that it had acquired such an easement by necessity or estoppel, the district court rendered judgment that the council had acquired the easement by prescription. In cross-appeals, the affected condominium owner and the council have joined issue as to whether the district court erred with respect to each of these easement theories. Concluding that the district court did not err in rejecting the council's easement-by-necessity and estoppel claims but did err in awarding an easement by prescription, we will affirm the judgment in part and reverse in part.

**BACKGROUND**

The disputed condominium property is located on the first floor of Cambridge Tower, a 15-story building situated on an Austin city block bounded by Martin Luther King Boulevard to the north, Colorado Street to the east, 18th Street to the south, and Lavaca Street to the west. Cambridge Tower was originally constructed in 1964 as an apartment complex. In 1979, Cambridge Tower's owner at the time, Cambridge Tower Corporation, converted the building into a condominium regime consisting of privately owned units—with three first-floor units designated for commercial use and approximately 165 units on higher floors for residential use—and common elements that include hallways outside the units, a first-floor lobby, elevators, a two-level parking garage located immediately below the first floor, and three stairways. At all relevant times, appellee, The Cambridge Condominium Council of Owners (Council), a non-profit corporation whose membership is comprised of the owners of condominium units in the building, has been charged under the condominium declaration with administering and governing the affairs of the building and its condominium regime, including managing and maintaining the common elements.

Although the "footprint" of the building's first floor appears somewhat larger, each of the residential floors of Cambridge Tower is rectangular in shape, with its long sides running north to south. Each floor's outer walls are ringed by condominium units except where a common-element elevator lobby abuts the building's eastern wall at roughly the midpoint on the building's north-south axis. A common-element hallway runs north to south through the middle of the floor, providing access to and from residential units located on either side of it, as well as the elevator lobby. At both the north and south ends of the floor, the hallway terminates at a door

2

entering into a stairwell (respectively, the "north stairway" and "south stairway"). A third stairwell is located adjacent to the elevators (the "central stairway"). Each stairway is a two-hour pressurized enclosure—it is designed to withstand a fire for two hours and to keep smoke out (except what little may enter when a person walks into the area). Barry Smith, who since 1992 has served as Cambridge Tower's property manager on the Council's behalf, testified that the stairwells are intended to serve not only as an escape route but a safe haven for residents in the event of a fire. Smith elaborated that many Cambridge Tower residents are elderly and would have difficulty traversing the stairwells to exit the building themselves. Thus, Smith explained, residents are instructed that the stairwells are their first line of defense in the event of a fire, where they could remain until they were assisted or rescued from the building. Although Smith acknowledged that the Council has never installed communications equipment in the stairwells that would enable residents seeking refuge there to alert first responders to their presence, there was testimony that the fire department would check the stairwells as part of their procedures when responding to a fire.

The south stairway runs from the building's roof through its residential floors, terminating in first-floor designated common-element space where one can exit onto 18th Street. The central stairway runs from the roof, through the residential floors, but continues past the first and through both levels of the underground parking garage. Like the south stairway, the central stairway may be entered or exited on the first floor through designated common-element space, the building's lobby. The north stairway begins at the building's roof, provides access to and from the residential and first floors, and terminates in the parking garage.

3

The district court heard evidence that since the building's 1964 construction, the first-floor area surrounding the north stairway has been configured to include a pair of hallways (termed the "North Corridor" by the district court and parties) that run between the north stairway and a doorway through the building's west (Lavaca Street) exterior wall. The North Corridor is at the center of the present dispute.

It is undisputed that, at all relevant times since Cambridge Tower's conversion to condominiums, the North Corridor and other first-floor areas surrounding the north stairway have been designated in the condominium declarations to be part of one of the first-floor commercial units—Unit 1A, which occupies 8,440 square feet encompassing essentially the entire first floor of Cambridge Tower north of the lobby area. It is also undisputed that since Cambridge Tower first conveyed Unit 1A to a separate owner, which occurred in 1982, none of the conveying instruments have purported to reserve or grant, on behalf of the grantor or others, any right to use the North Corridor for purposes of building ingress or egress. Nor, the parties agree, has there been any other instrument of record reserving or granting such a right. Instead, all instruments of record have shown that the north stairway, unlike Cambridge Tower's other two stairways, cannot be entered or exited through designated common-element space on the first floor, but is entirely surrounded by the separately owned Unit 1A.

During the 1980s, Unit 1A was acquired by First Cambridge Partnership, which also owned the other two first-floor commercial units, Units 1B and 1C. The partnership included Dan Womack, John McClish, and Mr. Womack's wife, Ima Jean Womack. First Cambridge Partnership was later succeeded by a limited partnership, IDJ, Ltd., that also included the Womacks

4

and McClish.[1]  Because there is no dispute that the two partnerships' interests are identical in all respects relevant to this case, we will refer to these entities as "FCP/IDJ."

FCP/IDJ undertook renovations on all three of its first-floor commercial units.  Some of the planned renovations required Council approval, including modifications to doors and walls in Unit 1C.  There was also evidence that FCP/IDJ's renovations to Unit 1A triggered a requirement that the unit, which had heretofore been governed by the City of Austin building code in effect during Cambridge Tower's 1964 construction, be updated to comply with the then-current version of the code.  During the permitting and approval process for these renovations, moreover, the City took the position that the North Corridor, irrespective of who owned it, was part of the north stairway's fire-exit system and had to be maintained and kept unobstructed for that purpose. Further, because the building had not been constructed with a sprinkler system (nor had the Council elected to install one), the City maintained that the then-current code required that the North Corridor, like the building's stairwells, be made a two-hour fire-resistant enclosure, which entailed improvements to the passageway's walls and new doors.  FCP/IDJ presented a written proposal to the Council whereby it offered to "grant[] the easement for the fire escape corridor" through the North Corridor if the Council would (1) approve FCP/IDJ's proposed plans for renovating Unit 1C, which it had previously submitted to the Council, and (2) "pay the cost of upgrading the fire escape corridor to a 2 hour firewall—according to the City Fire Code," "purchase and install double 2 hour fire protection doors to be installed in the corridor," and "pay the difference in cost between the cost for three regular office doors and 2 hour fire protection doors."  The

_____

[1]  I, D, and J signify the partners' first names—Ima, Dan, and John.

proposal contemplated, however, that the Council "will need to have the necessary legal documents prepared to effectuate the easement to be given by [FCP/IDJ] to the [Council]."

The Council took up FCP/IDJ's proposal during the special called meeting of its entire membership on September 29, 1988. The sole evidence of specific statements during this meeting is the Council's approved minutes.[2] We quote the relevant excerpts:

The First Cambridge Partnership Proposal—President Kahle introduced Secretary Joe Ann Watson. Director Watson read aloud the resolution presented by the First Cambridge Partnership as follows:

"WHEREAS the First Cambridge Partnership is presently renovating Units 1-A, 1-B, and 1-C of the first floor of the Cambridge and pursuant to the plans for that renovation needs the Council of Co-owners' permission to alter the exterior walls of Unit 1-C by replacing the doors on the west exterior wall of that unit with glass walls; and

WHEREAS the First Cambridge Partnership requests permission to move the location of the doorways in Unit 1-C from the common area hallway pursuant to the plans previously submitted to the Council of Co-owners; and

---

[2] Accompanying the copy of the typed and signed Council minutes in evidence are copies of the meeting notice, five proposed resolutions (one of which concerned FCP/IDJ's proposal), and the Council secretary's handwritten notes from the meeting. The minutes, excerpted above, reflect that the resolution concerning FCP/IDJ's proposal was adopted verbatim as proposed.

Neither the meeting notice nor the secretary's notes mentions any statements or agreements concerning the North Corridor beyond general references to the proposed resolution or FCP/IDJ's written proposal. The secretary's handwritten notes instead reflect that much of the discussion or debate during the meeting concerned the location of the mailboxes.

Although one attendee at the meeting did testify at trial—Ima Womack, FCP/IDJ partner and wife of Dan Womack, who presented the proposal on behalf of the partnership—she could not recall specific statements during the meeting.

6

WHEREAS the Code of the City of Austin requires a fire exit from the stairwell at the north end of the building to the outside from the first floor; and

WHEREAS the First Cambridge Partnership has agreed to provide an easement for the fire exit from the stairwell in the north end of the building to the outside; and

WHEREAS the Council of Co-owners wishes to relocate and enlarge the mailboxes on the first floor of the Cambridge to the south end of the building; and

WHEREAS the First Cambridge Partnership has agreed to install the new mail boxes in the south end of the building pursuant to the plans that were submitted to the Council of Co-owners; and

BE IT RESOLVED that the Cambridge Co-owners approve the plans which have been submitted."

A motion was made by the Board, seconded by owner C.W. Cook, to accept the resolution as presented. Mr. Danny Womack, of the First Cambridge Partnership, explained the proposal and asked for questions from the floor. After the discussion, a vote was taken. The motion passed by a vote of 71 approved, 42 disapproved.

Thereafter, according to Ima Womack, FCP/IDJ installed the "additional fireproofing" and the Council "paid the difference between our finish-out cost and the cost of fireproofing." Ms. Womack indicated that the improvements were ultimately completed in December 1989.

Despite the admonition in FCP/IDJ's written proposal, the Council never had the written documentation prepared to effectuate the express easement FCP/IDJ had agreed to grant, and no such easement was ever reduced to writing, executed, or recorded.[3] This stands in contrast to a June 1988 express easement that FCP/IDJ had granted to the Council across Unit 1B to provide

---

[3] Nor were the minutes of the September 1988 special meeting recorded in the real property records.

access to adjacent restroom facilities. This June 1988 easement was reduced to writing, executed, and recorded in the Travis County real property records.

In June 1989, the Council adopted a Revised Declaration of Condominium, which is recorded in the Travis County real property records. As with the original declaration, the revised declaration designates the North Corridor as part of Unit 1A and does not mention any easement or other right of access through the North Corridor, or any other restriction on the North Corridor's use.

Ms. Womack, who went on to serve four years on the Council's board of directors during the 1990s, including a two-year term as its president, testified that neither she nor anyone else ever raised the issue of the necessity of executing a written easement during the years that followed. She explained, "Quite honestly, I never thought about it." Nonetheless, according to Ms. Womack, FCP/IDJ never locked the door from the north stairway or otherwise impeded the ability of residents to traverse the North Corridor from the north stairway to the Lavaca Street exit. Ms. Womack explained that the partnership so limited its use of the North Corridor "[b]ecause it was a fire escape." There was also testimony that City fire inspectors would traverse the north stairway and North Corridor as part of annual fire safety inspections.

On March 7, 2000, FCP/IDJ contracted to sell Unit 1A to appellant Cambridge Holdings, Ltd. (Cambridge) for $840,000. In connection with the sale, the Council was required to provide a resale certificate at FCP/IDJ's request. *See* Tex. Prop. Code Ann. § 82.157(a) (West 2007). Barry Smith, the Cambridge Tower property manager, served as the Council's contact point during the sale and completed a resale certificate concerning Unit 1A in April and furnished it to FCP/IDJ. One of Cambridge's partners, Michael Voticky, reviewed the resale certificate, the

8

revised declaration, which was attached, and other documents. The plats attached to the declaration do not show the interior layout of Unit 1A, except for the location of the north stairway in the center of the unit and the restrooms. Shading is used to depict any common elements, and the only area within Unit 1A that is shaded is the north stairway. Additionally, the title policy showed no easements of record affecting the North Corridor. In fact, as previously indicated, there were no instruments of record that purported to reserve or grant an easement or other right of access in the North Corridor.

There is no contention that Cambridge had actual knowledge of FCP/IDJ's 1988 agreement to grant an express easement in the North Corridor. In fact, Barry Smith, who began managing Cambridge Tower in 1992, testified that even he had been unaware of the events during the September 1988 special meeting until he had been "extremely surprised" to discover the meeting minutes when responding to a discovery request during the subsequent litigation with Cambridge.

Voticky also inspected Unit 1A several times in advance of closing. At that time, there were lighted "exit" signs on the wall inside each end of the North Corridor, one above the doorway to the north stairway, the other above the doorway leading through the building's west outer wall. A fire-protection expert presented by the Council acknowledged that the exit signs signified that each doorway was a fire exit leading *from* the North Corridor, not into it, and Voticky indicated that he had understood the signs to mean this. Additionally, there were locks on the two doors that were activated from the North Corridor side. Although the condominium declaration designated these doors as common elements, the locks were designated to be part of Unit 1A.

9

On the other hand, on the north stairwell side of the door leading to the North Corridor was stenciled, "First Floor Exit." Voticky also testified that during one of his inspections, he triggered a "buzzer" by opening the door from the North Corridor side. According to Voticky, he inquired with Smith, who explained that the buzzer was part of the building's "safety" measures, serving as notice that someone had entered the area. The buzzer was not connected to the building's fire-alarm system.

The present dispute arose in late 2004 and early 2005, when Cambridge sought the Council's approval of a series of proposals to subdivide Unit 1A into separate units. Some of these proposals included reconfiguring the North Corridor to create more space for private occupancy. These discussions prompted the Council to hire a consultant, Frank Ivy, to analyze fire code issues related to the North Corridor. Ivy concluded in a February 2005 letter to Smith that the North Corridor "was an extension of the North Exit Stair and classified an Exit Enclosure and must continue to exit at the exterior of the building" and "is not to be used for private occupancy." Smith subsequently provided Ivy's letter to Mr. Voticky. Cambridge claims that Ivy's letter was the first indication it received of any contention that it was restricted from using the North Corridor for private occupancy.

Thereafter, Cambridge made a written demand that the Council pay it for what Cambridge contended was the diminution in value of Unit 1A attributable to the limitations on its use of the North Corridor and reimburse it pro rata for the other unit owners' shares of maintenance and renovation costs that Cambridge had incurred on the North Corridor since April 2000. After the

Council rejected these demands, Cambridge filed suit in July 2005 seeking a declaratory judgment[4] that it is the exclusive owner of the North Corridor and that the Council has no rights to, interest in, or easement in the North Corridor. In the alternative, in the event that the North Corridor is burdened by such an easement, Cambridge sought a declaratory judgment that the North Corridor is a common element under the revised condominium declaration, such that Cambridge is entitled to reimbursement for the other unit owners' shares of repair and maintenance costs as well as the portion of Unit 1A's purchase price that is attributable to the North Corridor. Also, assuming the easement's existence, Cambridge asserted common-law and statutory fraud claims against the Council for allegedly misrepresenting or failing to disclose the easement in the resale certificate its general manager prepared. The Council counterclaimed. It sought declaratory judgments that (1) the North Corridor is not a common element, and (2) the residential unit owners hold an easement in the North Corridor in any of three alternative ways—an "implied easement by prior and existing use," an implied easement by necessity, or an easement by estoppel. Both parties sought attorney's fees in connection with their declaratory-judgment claims.[5]

The claims were tried to the district court, which rendered judgment that the Council "holds a prescriptive easement to use the 'North Corridor' in Unit 1A leading from the first floor landing of the North Stair to the Lavaca Street door for the limited purpose of fire/emergency ingress and egress." The court rejected Cambridge's contrary declaratory claim that it had the exclusive right to the North Corridor, the Council's declaratory claims that it had acquired an easement by

---

[4] *See* Uniform Declaratory Judgments Act (UDJA), Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008).

[5] *See id.* § 37.009.

estoppel or necessity, Cambridge's declaratory claim that the North Corridor was a common element, and Cambridge's fraud claims. The district court awarded the Council $180,000 in attorney's fees through trial and a total of $50,000 in conditional appellate attorney's fees. The court further awarded post-judgment interest on the amount of the judgment, with interest on the contingent appellate attorney's fees accruing "from the date the notice of appeal is filed or the petition for review is filed, whichever is applicable." The district court subsequently entered findings of fact and conclusions of law.

Both Cambridge and the Council appealed.

## ANALYSIS

Cambridge brings twelve issues on appeal, while the Council brings three. These issues can be classified into essentially three groups. The first group of issues concerns the existence of an easement in the Council's favor "for the limited purpose of fire/emergency ingress and egress" through the North Corridor. In its first issue, Cambridge argues that the district court erred in holding that the Council had acquired a prescriptive easement in the North Corridor because, it asserts, the Council never pled such a theory, nor was the claim tried by consent. In its second issue, Cambridge challenges whether there was legally and factually sufficient evidence of each element required to establish a prescriptive easement.

In the event this Court sustains either of Cambridge's first two issues and reverses the district court's judgment awarding it the easement by prescription, the Council urges in its first two issues that the evidence conclusively establishes that it acquired the easement by estoppel.

12

In its third issue, the Council additionally asserts that the evidence conclusively establishes that the easement was created by implication from necessity.

Assuming we reverse the district court's judgment awarding a prescriptive easement and affirm the court's refusal to award one based on estoppel or necessity, Cambridge argues in its third issue that the district court erred in refusing to render judgment declaring that Cambridge had exclusive rights to the North Corridor. In the event we do not, Cambridge brings a second group of issues concerning its alternative claims for relief. In its fourth and fifth issues, Cambridge argues that the district court erred in refusing its claim for a declaration that the North Corridor is a common element and its claim for reimbursement for expenses it incurred in maintaining or improving that area. Similarly, in its sixth through ninth issues, Cambridge contends that the evidence conclusively establishes its entitlement to relief on its common-law and statutory fraud claims or that the court's refusal to award such relief was against the great weight and preponderance of the evidence.

In its third and final set of issues, Cambridge complains of the judgment award of attorney's fees and post-judgment interest on those fees. In its tenth and eleventh issues, Cambridge urges that the district court's attorney's fees award be reversed and remanded for reconsideration because the court's judgments on the declaratory claims' merits were erroneous and, even if not, because the amount of fees it awarded were inequitable and unjust. In its twelfth issue, Cambridge complains that the district court erred in ordering that post-judgment interest on appellate attorney's fees should accrue "from the date the notice of appeal is filed or the petition for review is filed, whichever is applicable," and that such interest should instead run from the date the appellate court's judgment becomes final. The Council concedes Cambridge's twelfth issue.

13

**Standard of review**

Most of the dispositive issues on appeal turn on whether the evidence was legally or factually sufficient to support the district court's judgment. When a party is challenging the legal sufficiency of the evidence supporting an adverse finding on an issue on which an opposing party has the burden of proof, it prevails if the record shows any one of the following: (1) there is no evidence supporting a vital fact, (2) the evidence offered to prove a vital fact is no more than a mere scintilla, (3) the evidence conclusively establishes the opposite of the vital fact, or (4) the court is barred by law or the rules of evidence from considering the only evidence offered to prove the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995). Conversely, evidence conclusively establishes a vital fact when the evidence is such that reasonable people could not disagree in their conclusions. *City of Keller*, 168 S.W.3d at 814-17.

When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it has the burden of proof, that party can prevail only if it demonstrates that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

When conducting a legal-sufficiency review, we must view the evidence in the light most favorable to the trial court's findings, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 807. Moreover, we must indulge every reasonable inference that would support the district court's findings. *Id.* at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When a party challenges the factual sufficiency of the evidence supporting an adverse finding on which the opposing party had the burden of proof, we should set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). When a party challenges the factual sufficiency of the evidence supporting an adverse finding on an issue on which that party had the burden of proof, we considered whether the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Francis*, 46 S.W.3d at 241. In either case, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the finding should be set aside. *See id.*; *Plas-Tex, Inc. v. U.S. Steel Corp*., 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

**Easement by prescription**

Cambridge's first two issues challenge the portion of the district court's judgment that awarded the Council a prescriptive easement in the North Corridor. A prescriptive easement may arise from a property owner's knowing acquiescence (whether actual or constructive) in a claimant's adverse use of the property under a claim of right for ten years or more. *See Scott*

15

*v. Cannon*, 959 S.W.2d 712, 721 (Tex. App.—Austin 1998, pet. denied); *Wiegand v. Riojas*, 547 S.W.2d 287, 290 (Tex. Civ. App.—Austin 1977, no writ). Generally speaking, the easement claimant has the burden of proving that he has been in possession of the easement in a manner that is (1) "open," (2) "notorious," (3) "exclusive,"and (4) "adverse" (5) continuously (6) for a period of ten years or more. *See Brooks v. Jones*, 578 S.W.2d 669, 673 (Tex. 1979); *Scott*, 959 S.W.2d at 721.

The "adversity" element is the same required to prove adverse possession. *See Scott*, 959 S.W.2d at 722. It requires that the claimant have acted under a "claim of right"—with intent to obtain a permanent right to use the property in a particular way, not merely to obtain permission from the rightful owner to do so. *See Ellis v. Jansing*, 620 S.W.2d 569, 571-72 (Tex. 1981); *Vrazel v. Skrabanek*, 725 S.W.2d 709, 711 (Tex. 1987). Relatedly, the claim of right must be inconsistent with the landowner's legal rights to use the property. *See Scott*, 959 S.W.2d at 722. This "does not require an intention to dispossess the rightful owner, or even know there is one." *Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006) (per curiam). What it does require is intent to permanently appropriate the right in the property "as one's own to the exclusion of all others; '[m]ere occupancy of land without any intention to appropriate it will not support the statute of limitations.'" *Id.* (quoting *Ellis*, 620 S.W.2d at 571 (quoting *Wright v. Vernon Compress Co.*, 296 S.W.3d 517, 522 (Tex. 1956))); *see also Ellis*, 620 S.W.2d at 571-72 ("'No matter how exclusive and hostile to the true owner the possession may be in appearance, it cannot be adverse unless accompanied by the intent on the part of the occupant to make it so. The naked possession unaccompanied with any claim of right will never constitute a bar.'" (quoting *Orsborn v. Deep Rock Oil Corp.*, 267 S.W.2d 781, 787 (Tex. 1954))). For example, possessing or using property in the mistaken belief that one

16

owns or has a right in it will not give rise to prescription if unaccompanied by intent to appropriate that right. *See Ellis*, 620 S.W.2d at 571-72 (no evidence of adverse possession where claimant's predecessor possessed strip of neighbor's property but "never claimed or intended to claim any property other than that described in his deed, or what he thought was contained in his deed, and he never intended to claim any property owned by the abutting property owners").

Furthermore, the adverse claim of right must have been "hostile," or having outward manifestations of such nature and character as to notify the property's true owner that the claimant is asserting a claim to a permanent right to use the property that is inconsistent with the rights of the owner. *See Scott*, 959 S.W.2d at 722. "As this Court has stated, there must be a *distinct* and *positive assertion* of a right which is brought to the servient owner's attention and which is hostile to the owner's rights." *Id.* (citing *Wiegand*, 547 S.W.2d at 289). Such an assertion may come in the form of a direct verbal assertion of a claim or be established by the character of the use of the property and surrounding circumstances. *See Orsborn*, 267 S.W.2d at 787 ("Claim of right must be manifested by declaration or by open or visible act. If there is no verbal assertion of claim to the land brought to the knowledge of the landowner, the adverse possession must be so open and notorious and manifested by such open or visible act or acts that knowledge on the part of the owner will be presumed."); *Scott*, 959 S.W.2d at 722-23 (affidavit filed by claimant asserting that roadway was public road sufficed as "distinct and positive assertion" of claim of right). In either case, the assertion must be of a nature that indicates the claimant "is asserting the right adversely to the true owner, and [be] inconsistent with the idea of a permissive use which may be terminated at the pleasure of the owner." *City of Austin v. Hall*, 48 S.W. 53, 55-56 (Tex. Civ. App.—Austin 1898,

17

no writ); *see also Callan v. Walters*, 190 S.W. 829, 832 (Tex. Civ. App.—Austin 1916, no writ) ("[T]he use or possession on which [prescription] is founded must be adverse, or of a nature to indicate that it is claimed as a right, and not the effect of indulgence or of any compact short of a grant.").

Consequently, where adversity and hostility are not shown, the claimant's use of the property is considered to have been with the owner's permission or license, as use of property, standing alone, is equally consistent with permissive use as it is with use under a claim of right. *See Othen v. Rosier*, 226 S.W.2d 622, 627 (Tex. 1950). And, as this Court has explained:

> It is well established in Texas that use of an easement by permission of the servient estate owner, either express or implied, no matter of what period of time, cannot subsequently ripen into a prescriptive right. [citing *Othen*, 226 S.W.2d at 626.] It is true that the use of an easement which originally was permissive may become adverse at a later date, but the presumption is that there is a continuation of the permissive use. To transform permissive use of an easement into an adverse use, there must be a distinct and positive assertion of a right which is brought to the servient owner's attention and which is hostile to the owner's rights.

*Wiegand*, 547 S.W.2d at 290.

For the use of property in itself to constitute the requisite "distinct and positive assertion" of a right in the property hostile to the owner's rights, the claimant's use of the property must be "exclusive;" i.e., the claimant has excluded or attempted to exclude all other persons—especially the property owner—from using the same property for the same purpose. *See Brooks*, 578 S.W.2d at 674. "While other jurisdictions do not require the prescriptive use to be exclusive [of] use by the owner of the land, this rule of property has long been the established rule in Texas." *Id.* It follows—and is equally well established—that proof merely of a joint use of the

18

property with the owner cannot establish a prescriptive easement because it does not signal an adverse claim of right but is consistent with permissive use. *See id.* at 673-74; *Scott*, 959 S.W.2d at 721-22; *see also Tran*, 213 S.W.3d at 914 ("Joint use is not enough, because 'possession must be of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant.'") (quoting *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990) (quoting *Rick v. Grubbs*, 214 S.W.2d 925, 927 (Tex. 1948))). Thus, "[i]t has long been the law in Texas that when a landowner and the claimant of an easement both use the same way, the use by the claimant is not exclusive of the owner's use and therefore will not be considered adverse." *Brooks*, 578 S.W.2d at 673. However, this Court has previously held that proof of joint rather than exclusive use is not necessarily fatal to a prescriptive-easement claim if the claimant makes some form of "distinct and positive assertion" of a hostile claim of right that is separate and apart from the claimant's use of the property. *See Scott*, 959 S.W.2d at 721-23.[6]

---

[6] *Scott* concerned a dispute over the Scott family's rights to use a road across the Cannon family's property that both families had used jointly for a number of years. In 1964, in connection with a loan application, the Scotts had filed an affidavit in the county real property records asserting that the road was a public road. *See Scott v. Cannon*, 959 S.W.2d 712, 717-18 (Tex. App.—Austin 1998, pet. denied). The Cannons did not discover the affidavit until 1972, whereupon the Cannons through their attorney informed the Scotts of their view that the road was not public. According to the Cannons, who prevailed at trial, their attorney told the Scotts to draft an express easement for the Cannons' consideration. When the Scotts did not present a written easement to them, the Cannons took no further action to restrict the Scotts' access or otherwise assert their rights in the road, perceiving that it was "a good time to just keep quiet" because the Scotts' use of the road from then on would be considered permissive. *Id.* at 718. Thereafter, the Scotts' joint use of the road with the Cannons continued.

19

Intertwined with these concepts are the requirements of "open" and notorious" use. "Open" use refers to use that is not made in secret or stealthily, while "notorious" use refers to use that is actually known to the property owner or is widely known in the area such that the property owner would reasonably be expected to know of it. *See Restatement (Third) of Property (Servitudes)* § 2.17 cmt. h (2000). The purpose of these requirements is to ensure that the property owner has ample opportunity to protect against the establishment of prescriptive rights. *See id.*

Finally, the requirement of "continuous" use has both a mental and physical aspect. The mental aspect requires that the easement claimant continue asserting an adverse and hostile claim of right to use the servient property throughout the prescriptive period. *See id.* § 2.17 cmt. i. If the claimant submits to the servient estate holder's title or abandons the claim under which the use is made, and/or the title holder interrupts the claimant's use physically or by legal action, the prescriptive period ceases to run. *See id.* § 2.17 cmts. i, j; *see also Wiegand*, 547 S.W.2d at 290

---

In the 1990s, litigation arose in which the Scotts claimed they had acquired a prescriptive easement to use the road. *Id.* at 717. In response, the Cannons relied on the rule that joint use of a roadway with a property owner is presumed to be permissive and cannot ripen into prescription. *See id.* at 721-22. Rejecting the Cannons' arguments, this Court distinguished cases applying this rule as "not controlling" on the basis that they involved "claimants [who] were trying to establish an easement by prescription based on *continuous use alone.*" *Id.* at 722. In contrast, the Court reasoned, *Scott* "involv[ed] *both* joint use *and* independent acts to show adversity." *Id.* The Court went on to hold that the 1964 affidavit (once the Cannons discovered it in 1972) was "the type of *distinct and positive assertion*" required to "'transform permissive use of an easement into an adverse use.'" *Id.* (quoting *Wiegand v. Riojas*, 547 S.W.2d 287, 290 (Tex. Civ. App.—Austin 1977, no writ)). It concluded that the affidavit (once discovered by the Cannons), the Scotts' continued use of the road thereafter, the absence of evidence "to show that after 1972 the Cannons gave the Scotts permission to use the Road or that the Scotts looked to the Cannons for permission," and evidence that the Scotts had helped pay for road repairs and maintenance "created the adversity needed to begin the prescriptive period." *Id.* at 722-23.

20

(landowner's fencing of property and locking of gate to block access to claimed easement across property interrupted the prescriptive period). How much use is necessary to demonstrate the required consistency of purpose depends on the character of the dominant estate and the normal use that an owner of the claimed easement would make. *Restatement (Third) of Property (Servitudes)* § 2.17 cmt. i. The physical aspect of the continuity requirement, on the other hand, requires that the use be open and notorious throughout the prescriptive period. *See id.*

"[C]reation of an easement by prescription is not favored in the law." *Wiegand*, 547 S.W.2d at 289. Evidence of a prescriptive easement "must be clear and positive, and should be strictly construed." *Callan*, 190 S.W. at 832. Before courts will take the "severe step" of "taking real estate from a record owner without express consent or compensation . . . the law reasonably requires that the parties' intentions be very clear." *Tran*, 213 S.W.3d at 915.

The district court found that the Council acquired an easement by prescription to use the North Corridor "for the limited purpose of fire/emergency ingress and egress" and that this easement is enforceable against Cambridge. In its first issue on appeal, Cambridge argues that the district court erred in awarding the Council a prescriptive easement in the North Corridor because the Council never pled such a claim. Instead, Cambridge argues, the Council went to trial on a "prescriptive easement" pleading that actually alleged a claim for an implied easement by prior and

21

existing use.[7]  The Council responds that it sufficiently pled a prescriptive-easement claim, and in any event, Cambridge failed to preserve its complaint below.

The question of whether the Council had sufficiently pled a prescriptive-easement claim was first raised by Cambridge during a pretrial hearing on motions in limine.  The parties had previously exchanged proposed jury charges (this case had originally been set on a jury docket) and one of the Council's proposed issues would have submitted a prescriptive-easement theory.  Responding to the Council's proposed prescriptive-easement submission, Cambridge's trial counsel stated "[i]t's not in their petition, and we're going to object to that.  And we're not going to try that by consent."  When questioned by the district court, trial counsel stated "there is no pleading to

---

[7]  An implied easement by prior and existing use requires proof of (1) unity of ownership between the dominant and servient estates; (2) apparent use of the easement at the time the dominant estate was granted; (3) continuous use of the easement, from which it is inferred that the parties must have intended its use to pass by grant with the dominant estate; and (4) reasonable necessity of the easement to the use and enjoyment of the dominant estate. *See Vinson v. Brown*, 80 S.W.3d 221, 228-29 (Tex. App.—Austin 2002, no pet.).  In the portion of their pleadings they characterize as a "prescriptive easement" claim, the Council alleged:

> Residential unit owners, whose titles also originated from Cambridge Tower Corporation, have continuously, openly, obviously, and peaceably used the North Corridor to access the fire exit from the North Exit Stairway, at all times since June 26, 1979.  Plaintiff and its predecessors in title purchased and took possession of Unit 1A with full knowledge of the existing use of the North Corridor to access the fire exit.  With no notice to the contrary, the remaining unit owners purchased and took possession of residential units, relying on use of the North Corridor to access the fire exit.  Therefore, Unit 1A is subject to an implied easement by prior and existing use by defendant and the remaining unit owners.  The use of the North Corridor fire exit was and continues to be physically necessary for the use of all the building residents.

The Council does not argue that the judgment can be supported on the theory of implied easement by prior and existing use, but instead asserts that these allegations and the evidence support the judgment that it acquired a prescriptive easement.

support that [claim]. And there will be no evidence to support at least one of the elements." The Council's attorney responded that its counterclaim for "an implied easement by prior and existing use" was intended to be the Council's prescriptive-easement claim because "[t]hat's what an easement by prescription is. It's prior and existing use. And that language is clearly stated in . . . our latest pleading. So we believe it is in the pleadings or we wouldn't have submitted it in our charge." The district court responded "[a]ll right" and then moved on to other issues.

Cambridge did not obtain an express ruling on this objection, file written special exceptions, or otherwise revisit its objection before trial. The trial record further reflects that, contrary to its prior assertions that it would not try the prescriptive-easement issue by consent, Cambridge elicited testimony uniquely relevant to the elements of a prescriptive-easement claim. For example, Cambridge's trial counsel asked Voticky to testify as to whether "anyone has ever attempted to exclude you as one of the owners of Cambridge from using the hallways at issue"—a reference to the exclusivity element of a prescriptive-easement claim—after explaining to him that "[a]nother claim in this lawsuit is that there should be an easement, a prescriptive easement it is called." Similarly, during Cambridge's direct examination of Barry Smith, the property manager, trial counsel asked: "Are you aware of the council that is filing this easement claim ever taking any action that's adverse to my client's ownership of the north corridor?" Cambridge likewise did not object to similar evidence elicited by the Council. Assuming without deciding that Cambridge's pretrial objection would have preserved its complaint regarding the sufficiency of the Council's pleadings of a prescriptive-easement claim, we conclude that Cambridge waived that complaint by permitting the claim to be tried by consent. Tex. R. Civ. P. 67; *cf. Boyles v. Kerr*, 855 S.W.2d 593,

23

601 (Tex. 1993) (holding claim not tried by consent where proof was relevant to both pled and unpled claims); *Bedgood v. Madalin*, 600 S.W.2d 773, 775-76 (Tex. 1980) (holding issue not tried by consent when opposing party objected to both presentation of evidence and submission of jury question on issue). We overrule Cambridge's first issue.

In its second issue, Cambridge challenges the legal and factual sufficiency of the evidence supporting the district court's findings and conclusions that the Council had used the North Corridor for "fire/emergency ingress and egress" "continuously" for more than ten years, that the Council's use was "open" and "notorious," that its use was "adverse," and that Cambridge was bound by the easement. The district court made the following fact findings addressed to the requirements of "continuous" "use" for ten years or more:

3.  The North Corridor of Unit 1A has been consistently used by the Council for the purposes of fire/emergency ingress and egress since at least 1979. A building plan predating the creation of the condominium reflects the existence of the North Corridor as a first floor exit from the North Stair.

4.  The door from the North Stair leading to the North Corridor has never been locked to restrict exit from the North Stair. The door has not been locked because the North Corridor is the fire exit from the North Stair. Further, longtime resident and management employee, Betty Strongbow, testified that the North Corridor has always been there and that, since 1964, when the building was erected, access from the North Stair to the Lavaca Street exit doors has never been blocked.

Based on these findings, the district court concluded that "the Council continuously used the North Corridor" for "the limited purpose of fire/emergency ingress and egress" "for a period of more than 10 years."

24

The district court further found that "the doorway leading from the North Stair . . . open[s] out into the North Corridor," that "the exterior doors to the North Corridor . . . open out onto Lavaca Street," and that "[a]ll doors in a fire/emergency exit passage way swing in the direction of the intended exit, as did this one." It also found that "an alarm . . . had been placed on the door leading from the North Stair to the North Corridor." Based on these findings, the district court concluded that "the configuration of the North Stair, the unlocked door opening out into the hallway that leads to the nearest outside exit opening onto Lavaca Street, as well as the existence of an alarm, rendered the use of the North Corridor as a fire/emergency ingress and egress open and notorious."

On the other hand, it was undisputed that the Council has never excluded or attempted to exclude any owners of Unit 1A or their tenants from using the North Corridor for fire or emergency ingress or egress. Thus, it was conceded that any "use" of the North Corridor by the Council for this purpose would have been no more than joint use with Unit 1A's owner, not the exclusive use that prescription ordinarily requires. *See Brooks*, 578 S.W.2d at 673. Consequently, there is no question that this case is governed by Texas's longstanding rule that an easement claimant's mere joint use of a way with the property owner is not adverse and cannot ripen into prescription unless and until the Council made a "distinct and positive assertion" of a claim of right to use the North Corridor so as to come within the exception this Court identified in *Scott*. *See Scott*, 959 S.W.2d at 721-23. And only at that point would the ten-year prescriptive period begin to run. *See Wiegand*, 547 S.W.2d at 290. Evidently recognizing this, the district court made the following fact findings addressed to *Scott*'s exception to the exclusive-use requirement:

25

5.    The law firm of Womack and McClish, P.C. had their offices on the first floor of the Cambridge Condominium building for many years. Unit 1A was owned by the partnership IDJ Ltd. prior to its sale to Cambridge. The partners in IDJ Ltd. are Ima Womack, Dan Womack, and John McClish.

6.    At a 1988 condominium meeting, Dan Womack, General Partner of IDJ Ltd., and the prior owner of Unit 1A and member of First Cambridge Partnership, and the Council were present when the Council asserted an easement to the North Corridor. At the same meeting, Dan Womack agreed to provide the Council an easement. The parties to this agreement also recognized at that time that an emergency exit from the North Stair through the North Corridor to the outside was required under City Code.

7.    After 1988, the Council paid for fireproofing and repairs of the North Corridor. These improvements were made in order to fireproof the hallway and doors.

The district court further found or concluded that "the Council made a distinct and positive assertion of its right to use the North Corridor in case of a fire/emergency through its agreement with IDJ Ltd. in which the Council paid for fireproofing of the North Corridor."

Finally, the district court made fact findings addressed to whether Cambridge had acquired Unit 1A subject to the prescriptive easement it had found, or was a bona fide purchaser for value who took the property free of that interest. The court found that Voticky, "a representative and partner of Cambridge" and "experienced real estate developer," had observed the doors that opened from the north stairway into the North Corridor and from the North Corridor to Lavaca. Moreover, the court found, Voticky had triggered the alarm on the north stairway door and been "informed by a representative of the Council that the alarm was part of the safety equipment of the building." Based on these findings, the district court concluded that "Cambridge had sufficient notice of the

26

implied easement" and that "[f]or the same reasons that the use of the North Corridor was open and notorious, Cambridge also had sufficient notice of the implied easement."[8]

Under the district court's findings and conclusions, the ten-year prescriptive period would have begun to run at the time of the "1988 condominium meeting"—which, the parties agree, refers to the September 29, 1988 special meeting of the Council. During that meeting, the district court found, "the Council asserted an easement to the North Corridor." However, as Cambridge points out, there is no evidence that the Council "asserted an easement to the North Corridor" during that meeting unless that phrase is intended to refer to the Council's resolution memorializing that *FCP/IDJ* had *agreed to grant* an express easement in exchange for approving FCP/IDJ's proposed renovations and paying for the fireproofing improvements to the North Corridor. The Council does not appear to contend otherwise.

In the district court's view, echoed by the Council, the resolution and agreement constituted the required "direct and positive assertion" of a claim of right by the Council that is sufficient to distinguish its undisputedly joint use of the North Corridor from permissive use and thus trigger the prescriptive period. *See Brooks*, 578 S.W.2d at 673; *Scott*, 959 S.W.2d at 721-23; *Wiegand*, 547 S.W.2d at 290. However, Cambridge points out another reason why the prescriptive period could not have begun running any earlier. By resolving that FCP/IDJ "has agreed to provide an easement" through the North Corridor without disputing that this right was FCP/IDJ's property to grant, the Council acknowledged the superiority of FCP/IDJ's title. *See Texas W. Ry. Co.*

---

[8] Although implied easements and prescriptive easements are distinct concepts under Texas law, there is no dispute that the district court was using "implied easement" to refer to the prescriptive easement it had found.

*v. Wilson*, 18 S.W. 325, 326 (Tex. 1892) ("A single act of acknowledgment by the [claimant] of the owner's title is fatal to the [prescriptive easement]."); *see also Stallman v. Newman*, 9 S.W.3d 243, 249 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (claimant's failure to dispute property owner's authority to grant permission to use road belied claim of right to use road). For both of these reasons, the Council's prescriptive-easement claim must rest upon evidence of events during and after the September 1988 special meeting.

Cambridge argues that there is legally insufficient evidence that the Council, its members, or tenants used the North Corridor "for the purposes of fire/emergency ingress" and egress adversely, openly, notoriously, and continuously for the prescriptive period. As Cambridge observes, the adverse use of property necessary for prescription requires actions that would give rise to causes of action in tort for interference with property rights if undertaken without the owner's consent. *See Klein v. Gehrung*, 25 Tex. 232, 242 (1860); *Hall*, 48 S.W. at 55-56; *Restatement (Third) of Property (Servitudes)* § 2.16 cmt. b, c. In the case of the North Corridor, this means actual physical entry or invasion by the Council or its residents for purposes of fire or emergency. *See Restatement (Third) of Property (Servitudes)* § 2.16 cmt. c, § 2.17 cmt. d. Although the Council helped pay for fireproofing improvements FCP/IDJ made to the doors and walls of the North Corridor in 1988 or 1989 in anticipation of using it as a fire exit, there was scant testimony that the Council or residents had ever actually made such use of the North Corridor thereafter. It was undisputed that there had never been a fire in the Cambridge Towers in which the North Corridor had been used for ingress or egress. Moreover, both Barry Smith and Marie Arnold, the Council's president at time of trial, testified that the Council did not conduct fire drills because of the advanced age and mobility

28

limitations of many of the residents. The sole testimony indicating that the North Corridor had ever been physically entered by Cambridge Tower residents for fire or emergency-related purposes came from Smith, the Council's general manager since 1992. Smith answered, "Yes," when asked whether "residents of Cambridge Tower have used the [North Corridor] when the fire alarms had gone off." However, the Council did not elicit any further testimony as to whether this had occurred on only one occasion or many, or how many, when this had occurred, over what period of time this had occurred, how many residents had entered the North Corridor on any such occasions, how long they were there, or any other circumstances regarding any such incidents.

As the Council suggests, the nature, intensity, or frequency of property use that suffices to establish continuous adverse use may vary according to the character of the claimed easement and the normal use its owner would make of it. *See Restatement (Third) of Property (Servitudes)* § 2.17 cmt. i. Nonetheless, even considering that the Council claims an easement to use the North Corridor as a fire or emergency escape—a function whose normal utilization would be relatively infrequent—it remains that the Council had the burden of presenting *some* evidence of the nature and extent of any use it made of the North Corridor for fire or emergency purposes. It failed to do so.

The district court's finding that the North Corridor had been "consistently used by the Council for the purposes of fire/emergency ingress and egress since at least 1979" presumably rests upon evidence that the Council believed or anticipated it could use the North Corridor as a fire or emergency exit, even if it hardly ever did. However, an easement claimant's beliefs or intentions are not adverse use. *See Tran*, 213 S.W.3d at 914 ("[T]here must be adverse *possession*, not just

29

adverse *beliefs*."). Alternatively, the findings must rest upon evidence that *FCP/IDJ* continuously limited or burdened its own use of the North Corridor so the Council could use it in the event of an emergency. This is the import of the district court's findings that "access from the North Stair to the Lavaca Street exit doors has never been blocked" and that the "door from the North Stair leading to the North Corridor has never been locked to restrict exit from the North Stair . . . because the North Corridor is the fire exit from the North Stair." Beyond this, the Council also points to evidence that City fire inspectors traversed the North Corridor, along with other building areas, during annual inspections of Cambridge Tower; considered the North Corridor to be part of the north stairway fire-exit system for code purposes; and that FCP/IDJ's continued accession in keeping the passageway unobstructed enabled the building to pass inspection without need for the Council to make other provision for emergency access at the building's north end. However, none of these acts represent actions of the Council. "As distinguished from easements . . . in which one looks to the intent or actions of the alleged easement's grantor," this Court has previously observed, "an easement by prescription rests upon the *claimant's* adverse actions under a color of right." *Scott*, 959 S.W.2d at 721 (emphasis added).

Although the present circumstances potentially implicate other easement theories, as the Council argues below, it cites no Texas cases that have recognized an easement by *prescription* on facts such as these. The Council does cite a Kentucky supreme court case and Massachusetts intermediate appellate court case that recognized an easement by prescription in a fire escape.[9]

---

[9] *See Ben Snyder, Inc. v. Phoenix Amusement Co.*, 218 S.W.2d 62, 64 (Ky. 1949); *Brooks, Gill, & Co. v. Landmark Props.*, 503 N.E.2d 983, 985 (Mass. App. Ct. 1987). Additionally, we observe that the Third Restatement of Property identifies a somewhat broader concept of prescription

30

However, we are not persuaded that Texas law operates the same way, especially given our courts' traditional disfavor toward prescriptive easements. *See Wiegand*, 547 S.W.2d at 289.

In short, we agree with Cambridge that the Council did not present legally sufficient evidence of the sort of adverse and continuous use of the North Corridor required to give rise to a prescriptive easement under Texas law. Consequently, we sustain Cambridge's second issue. We express no opinion regarding Cambridge's other legal-sufficiency challenges to this portion of the judgment.

**Easement by estoppel**

Having concluded that the evidence is legally insufficient to support the district court's judgment awarding the Council a prescriptive easement in the North Corridor, we now turn to the Council's cross-points urging us to render judgment awarding an easement under its other theories. In its first two issues, the Council argues that the evidence conclusively establishes each element of its claim for easement by estoppel. Easement by estoppel (also termed estoppel in pais) is an equitable doctrine whereby courts may, in certain situations, bar a property owner from disputing the existence of an easement on his property where the owner has led another property owner to rely to his detriment on the easement's existence. *See Storms v. Tuck*, 579 S.W.2d 447, 451 (Tex. 1979); *Murphy v. Long*, 170 S.W.3d 621, 625-27 (Tex. App.—El Paso 2005, pet. denied);

---

that includes a doctrine of "acquisitive prescription" that can arise even where the requisite adverse use by the easement claimant is lacking. *See Restatement (Third) of Property (Servitudes)* § 2.16 & cmts. a-c, § 2.17 (2000). However, the Council has not contended that this doctrine is recognized in Texas law.

*Scott*, 959 S.W.2d at 720. "Being a creature of equity, it seeks to prevent injustice and to protect innocent parties from fraud." *Storms*, 579 S.W.2d at 451; *see Scott*, 959 S.W.2d at 720.

Easement by estoppel "is a legal theory the exact nature and extent of which has not been clearly defined." *Storms*, 579 S.W.2d at 451. While the doctrine "is frequently applied in a few definite categories of suits involving land"—those arising out of or involving (1) a dedication of a street, alley, or square; (2) a conveyance with reference to a map or plat; and (3) a seller of land who allows its purchaser to expend money on an alleged "servient estate"—"the authority for its application outside those categories is 'rare and nebulous.'" *Id.* & n.3 (quoting *Drye v. Eagle Rock Ranch*, 364 S.W.2d 196, 209 (Tex. 1962)); *see also Scott*, 959 S.W.2d at 720. This Court has held that a vendor-vendee relationship must exist to establish an easement by estoppel, although some of our sister courts have since questioned that holding. *Scott*, 959 S.W.2d at 720 (citing *Storms*, 579 S.W.2d at 451, and *Wilson v. McGuffin*, 749 S.W.2d 606, 610 (Tex. App.—Corpus Christi 1988, writ denied)); *see also Lakeside Launches, Inc.*, 750 S.W.2d at 872 (noting that "to create an easement by estoppel, something must be said or done by the owner of the servient estate at the time of the grant of the dominant estate that induces the acceptance of the grant"); *cf. Murphy*, 170 S.W.3d at 624-27; *Mack v. Landry*, 22 S.W.3d 524, 529-30 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

The basic elements required to establish an easement by estoppel are: (1) a misrepresentation by the alleged servient property owner, communicated to the easement claimant, that the claimant has a right to use the property; (2) the communication is believed; and (3) the claimant detrimentally relies on the communication. *Scott*, 959 S.W.2d at 720. Texas courts have

32

held that actions amounting to misrepresentations regarding an easement may potentially be established by proof that the alleged servient property owner made a parol grant of the easement (which the owner could otherwise avoid by invoking the statute of frauds or conveyances), that the owner misrepresented that the easement already exists, or that the owner made a parol promise or agreement to grant the easement. *See Storms*, 579 S.W.2d at 451-53; *Murphy*, 170 S.W.3d at 624-27; *Scott*, 959 S.W.2d at 720. Regardless, "[e]ssential to the creation of estoppel is that the misrepresentation be communicated to, believed, and relied upon by the innocent party." *Storms*, 579 S.W.2d at 452; *Scott*, 959 S.W.2d at 720. The evidence must also show that the elements of easement by estoppel were present at the time the statements giving rise to the alleged easement were made. *See McAshan v. River Oaks Country Club*, 646 SW.2d 516, 519-20 (Tex. App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.) (holding no easement by estoppel when documents presented as evidence of alleged representations regarding property had been created after house was built in alleged reliance on representations).

Regarding the Council's easement-by-estoppel claim, the district court found that "Cambridge as a subsequent purchaser to Unit 1A did not make any representations to Council that there was an easement." While not disputing that the evidence supports this finding, the Council suggests it is immaterial because the evidence conclusively establishes that an easement by estoppel had already been created during FCP/IDJ's ownership. The Council urges that FCP/IDJ "communicated to the Council that it would grant an easement to use the North Corridor for an emergency exit," and "[t]he Council believed this representation and relied upon it in making improvements to the North Corridor to meet City fire code requirements." The Council adds that

33

Cambridge, while a subsequent purchaser for value, is bound by the easement because it had actual or constructive notice of it. *See Lakeside Launches*, 750 S.W.2d at 873 (no easement by estoppel may be imposed against a subsequent purchaser for value who has no notice, actual or constructive, of the easement claimed). In support, it relies on the district court's findings that Cambridge had "sufficient notice" of the prescriptive easement it had found. Based on these arguments, the Council in its first issue urges that the district court erred in denying its easement-by-estoppel claim. In its second issue, the Council urges us to revisit our holding in *Scott* that easement by estoppel can arise solely within a vendor-vendee relationship.

We express no opinion as to the Council's second issue because, assuming without deciding that a vendor-vendee relationship is not required to establish easement by estoppel, we conclude that the evidence does not show conclusively that FCP/IDJ made any statements in the nature of fraudulent misrepresentations to the Council regarding the existence of an easement in the North Corridor or any agreement to grant one. *See Scott*, 959 S.W.2d at 720-21. To the contrary, the district court heard evidence that FCP/IDJ explicitly advised the Council, as part of its written proposal to grant an easement in the North Corridor in exchange for the Council paying for fireproofing and approving FCP/IDJ's renovations, that the Council "will need to have the necessary legal documents prepared to effectuate the easement to be given by [FCP/IDJ] to the [Council]." That the Council never did so, even while proceeding to pay for fireproofing, is not evidence, much less conclusive evidence, that it was defrauded by FCP/IDJ about whether the easement existed or what remained to make it effective. *See Storms*, 579 S.W.2d at 451-52, 454; *Scott*, 959 S.W.2d at 720-21; *see also Sorrell v. Gengo*, 49 S.W.3d 627, 632-34 (Tex. App.—Beaumont 2001, no pet.)

34

(mere fact that grantor had agreed to reserve an express easement but subsequently failed to do so in the deed is not evidence of a misrepresentation that can form the basis for easement by estoppel).

More broadly, we cannot conclude that the evidence conclusively establishes a situation where justice requires estoppel to enforce the easement FCP/IDJ had agreed to grant the Council. *See Storms*, 579 S.W.2d at 451-52; *see also Wilson*, 749 S.W.2d at 610. In discussing the relative equities in a situation like this, the Restatement observes:

> If the parties have fully negotiated a servitude arrangement, but contemplate that a written document will be executed to finalize the transaction, giving effect to the oral arrangement ordinarily will not be justified. Only in extraordinary circumstances would reliance on the oral agreement be justified. The Statute of Fraud's function to protect parties against tentative, nonfinal arrangements is clear in this situation, and should not be overridden absent extraordinary circumstances.

*Restatement (Third) of Property (Servitudes)* § 2.9 cmt. e, § 2.10 cmt. c (2000). Here, there was evidence that the parties contemplated not only that written documentation would be required to effectuate FCP/IDJ's conveyance of an easement, but that the Council would handle getting those documents prepared. If the Council had followed through with these steps and an express easement had been executed and recorded, it is unlikely (as the Council itself has suggested) that this litigation—a dispute illustrative of why Texas has a statute of frauds and recording laws—would ever have arisen. In these circumstances, we cannot conclude as a matter of law that this is one of those "rare and nebulous" cases where estoppel is required to prevent an injustice against an innocent party. *See Storms*, 579 S.W.2d at 451; *Scott*, 959 S.W.2d at 920; *see also Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993) ("[E]quity aids the diligent and not those who slumber on their rights." (quoting *Callahan v. Giles*, 155 S.W.2d 793, 795 (Tex. 1941))).

35

We overrule the Council's first and second issues.

**Easement by necessity**

In its third issue, the Council argues that the evidence conclusively establishes an implied easement by necessity permitting it to use the North Corridor for fire or emergency ingress or egress. An "implied" easement may arise in the context of a conveyance that severs ownership of two estates in real property. In certain circumstances where the right to use one estate is considered especially critical to the use or enjoyment of the other estate, the law will imply an easement in favor of the second estate, in derogation of the terms of the written conveying instrument, in the view that the parties must have intended to include such a term in the conveying instrument. *See Mitchell v. Castellaw*, 246 S.W.2d 163, 167-68 (Tex. 1952); *Restatement (Third) of Property (Servitudes)* § 2.11 (2000). The Council argues that an implied easement by necessity arose when Cambridge Tower Corporation converted the building it then wholly owned to a condominium regime in 1979 and sold Unit 1A to Cambridge's predecessor in 1982.

To establish an implied easement by necessity, the Council was required to prove: (1) a unity of ownership over Unit 1A and the common areas and other units that the easement would benefit; (2) fire or emergency access through the North Corridor is a "necessity," not merely a "convenience;" and (3) the necessity has existed since the time the estates were severed. *See Koonce v. Brite Estate*, 663 S.W.2d 451, 452 (Tex. 1984). There is no dispute that the Council satisfied the first element—Cambridge Tower Corporation originally owned the entire building. The controversy, rather, has concerned the existence of a "necessity" that the Council and members other than Unit 1A's owner use the North Corridor for fire or emergency access and whether such a necessity existed

36

when Cambridge Tower Corporation severed ownership of Unit 1A from ownership of the properties the North Corridor's use would benefit.

Texas courts have historically been hesitant to judicially rewrite written conveyances based on unstated intent implied from necessity. They have required proof that the proposed use of one estate is economically or physically essential for the use of the other, and not merely desirable or convenient. *See Mitchell*, 246 S.W.2d at 167 (in case involving portion of gas station's "wash shed" that encroached on adjacent property, looking to whether "the station could not have been properly conducted without it or that a readjustment of the shed so as to eliminate the encroachment would have been impracticable for any reason"); *Callan*, 190 S.W. at 832 ("A way of necessity must be more than a way of convenience; it must be an absolute necessity, without which the party claiming it would be wholly deprived of the use of his land."); *Hall*, 48 S.W. at 55 ("The doctrine of necessity means just what it says. The right . . . must arise by reason of the absolute necessities of the claimant . . . ."). The courts have been especially reluctant to imply reservations of easements by the original grantor at the expense of the grantee and have required "strict necessity as prerequisite to all implied reservations of easements." *See Mitchell*, 246 S.W.2d at 167-68. For example, in numerous cases involving realty lacking frontage on a public road, Texas courts have required the landlocked property owner to prove he has literally no other means of accessing his property, regardless how circuitous or inconvenient the available alternative routes might be. *See, e.g.*, *Duff v. Matthews*, 311 S.W.2d 637, 642-43 (Tex. 1958) (no easement by necessity even

though other means of access over claimant's own land was currently impassable and would require clearing and repair).[10]

This Court has applied the same principle to hold that a building owner had not proved that use of a shared stairway in an adjacent bank building was necessary for the use of the upper floors of his building because he could build his own stairway inside his building. *Callan*, 190 S.W. at 832. Although we acknowledged that building the alternative stairway "would cost something" for the owner, we held that "whether or not the cost would exceed the benefit is immaterial, it clearly appearing that the use of the stairway in the bank building is not necessary to the use of the upper story of the [claimant's] building." *Id.*

The district court heard evidence that Cambridge Tower residents, including those living near the north stairway, have multiple alternative routes through which they could conceivably depart the building without traveling through the North Corridor. These routes incorporate various combinations of the building's two other stairways and hallways traversing each of the building's floors. These routes include proceeding directly to either the central or south stairwells on any given residential floor—both code-compliant, 2-hour fire-resistant enclosures—where they could either exit the building or seek refuge there without ever entering the north stairwell or North Corridor.

---

[10] In these ways, Texas law is more restrictive regarding easements by necessity than that of many other states. For these reasons, we are not persuaded by the reasoning of New York cases the Council cites that found easements by necessity in fire exits. *See Bennett v. 48 Laight St. Assocs.*, 784 N.Y.S.2d 919 (N.Y. Sup. Ct. 2004); *Mid-Central Props., Ltd. v. 344 W. 45th St. Corp.*, 341 N.Y.S.2d 912, 914 (N.Y. Sup. Ct. 1972), *aff'd*, 41 A.D.2d 606 (N.Y. App. Div. 1973). Unlike Texas, which requires a showing of strict necessity by a grantor claiming an easement, New York requires only that the "claimed necessity is real and reasonable." 49 N.Y. Jur. *Easements and Licenses in Real Property* § 90 (2009).

Alternatively, Cambridge pointed out that residents could continue down the north stairway to the building's parking garage, where they could proceed to the garage exit on the south (18th Street) side of the building,[11] up a ramp, and out onto street level, all without entering the North Corridor. The court found that "[i]t is . . . undisputed that the Council has another access besides the North Corridor from the building to the street." Based on this fact finding, the district court concluded that "[t]he element of necessity is not met because Council has another way into and out of the building."

The Council does not challenge the evidence supporting this fact finding but disputes its legal significance. The finding, in the Council's view, "misses the point" that its easement-by-necessity claim is not predicated on building residents' need to use the North Corridor for access to their units, but on the residents' need to use it for the specific purpose of a fire exit. Consequently, the Council reasons, "case law dealing primarily with rural land disputes which state that any exit route, albeit circuitous, is an available exit which defeats a claim to an easement by necessity" is simply inapposite. It urges that "[a]n emergency exit, by definition, is not circuitous and should not involve winding through different smoke filled hallways or through an underground parking lot (which, it adds, would be "filled with hundreds of cars, containing thousands of gallons of gasoline").

The evidence, the Council further contends, conclusively establishes that no alternatives to the North Corridor are available as code-compliant fire or emergency exits, at least

---

[11] There was also evidence that the garage exit gate opened automatically if the building's fire alarm system was triggered.

for building residents living in the northern part of Cambridge Tower. Moreover, the Council asserts, the evidence conclusively establishes that the city fire code, both currently and at the time of severance, has required the use of the North Corridor as a designated fire or emergency exit. The City relies on testimony from two expert witnesses, Chief Donald Smith, head of the City of Austin Fire Department's prevention division, and Phillip Haught, a fire safety engineer. Both testified to the effect that the North Corridor, once constructed, has been considered for fire code purposes to be part of the north stairwell fire exit and, for this reason, must remain in its current configuration and be available for use in the event of a fire.

For at least the following reasons, we conclude that the evidence falls short of conclusively establishing that use of the North Corridor as a fire or emergency exit was "strictly necessary" as of 1982, when ownership of Unit 1A was severed from the properties that use would benefit. First, even if the city building code has required that the North Corridor remain part of the north stairwell fire exit, the Council did not demonstrate how or why failure to comply with this requirement would equal wholly depriving the Council or residential unit owners of the use of their property, as the doctrine of easement by necessity requires. *See Mitchell*, 246 S.W.2d at 167; *Callan*, 190 S.W. at 832. This is the import of the district court's unchallenged fact finding that "the Council has another access besides the North Corridor from the building to the street"—there were multiple alternative routes by which one could access, use and enjoy any area of the building without entering the North Corridor. And, in the event of a fire, it is undisputed that residents on any given floor would have available three alternative fire-protected, pressurized stairwells in which they could seek

40

refuge or exit the building—the central, south, and north stairwells, with their use of the latter limited solely by the requirement that they exit anywhere other than the first floor.

Even accepting the Council's premise that necessity equals a fire exit that strictly complies with the building code, the district court reasonably could have concluded that the north stairwell and North Corridor were not strictly necessary as a fire-exit system under the code version in effect in 1982. There was evidence that when Cambridge Tower was constructed in 1964, issues relating to fire exits would have been governed by a 1931 building code and that these requirements continued to govern, notwithstanding any intervening changes or updates in the code, until FCP/IDJ's 1988 renovations. Haught and Smith left open whether that 1931 code permitted only two fire exits in Cambridge Tower and whether the central and south stairways would have sufficed for that purpose. Moreover, Haught acknowledged that even under a 1964 building code he thought would have governed at the time of the building's 1979 condominium conversion, the central stairway would have sufficed as a fire exit for the northern portion of the building except for certain "northeast or northwest apartments" in which "the farthest point in those apartments to the center stairway would be in excess of 150 feet."

Additionally, both Haught and Frank Ivy, the inspector who analyzed the fire-exit issue for the Council in 2005, acknowledged that it was possible that the Council and residential owners could create a code-compliant fire-exit system in the northern part of the building to serve as an alternative to the north stairway or North Corridor. These options included making renovations to the north stairway and/or adjacent property or constructing an alternative fire exit outside the building's current outer walls. As Ivy put in regard to this issue, "There's all kind of ways to skin

41

a cat." This Court relied on similar evidence in *Callan*, holding that where a building owner was free to build a stairway within his own building to reach his upper floors, there was no necessity requiring an easement to use a stairway in an adjacent building. *See Callan*, 190 S.W. at 832. The Council urges that the present case is distinguishable from *Callan* because "[t]he exterior of the North Side of the building is entirely surrounded by private units" and "[t]here is simply no way to construct an accessible exit structure that leads from the common element hallways on upper floors of the north side of the building to the ground." While the Council alone may not currently own all of the property through which an alternative fire exit could be constructed, it remains that the property where an alternative fire exit could be built is within the ownership of either the Council or the residential condominium owners on whose behalf the Council is seeking to burden the Cambridge-owned North Corridor. Thus, as in *Callan*, there is no *necessity* to burden Cambridge's property to benefit the Council or other owners, as that concept is recognized in Texas law, because they remain free to build an alternative to the north stairway on their own property.

We overrule the Council's third issue.

**Remaining issues**

Because we have affirmed the district court's judgment rejecting the Council's easement-by-necessity and easement-by-estoppel claims and reversed its judgment awarding the Council a prescriptive easement, we sustain Cambridge's third issue, and reverse and render judgment declaring that the North Corridor of Unit 1A is not subject to an easement for fire/emergency ingress and egress in favor of the Council. As Cambridge's fourth through

ninth issues are predicated on a judgment that an easement in the Council's favor did exist, we do not reach them.

In light of our disposition of Cambridge's second and fourth issues, we sustain Cambridge's tenth issue, reverse the judgment award of attorney's fees, and remand the parties' attorney's fees claims to the district court for reconsideration. *See Robertson v. City of Austin*, 157 S.W.3d 130, 137 (Tex. App.—Austin 2005, pet. denied). We thus do not reach Cambridge's eleventh and twelfth issues concerning the amount of that award.

## CONCLUSION

We affirm the district court's judgment denying relief on the Council's easement-by-necessity and easement-by-estoppel claims, reverse the judgment awarding the Council a prescriptive easement and denying Cambridge a declaration that the North Corridor of Unit 1A is not subject to an easement for fire/emergency ingress and egress in favor of the Council, and render judgment granting Cambridge that declaration. We also reverse the judgment award of attorney's fees and remand the parties' attorney's fee claims for further proceedings.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed: June 11, 2010

43